UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CERIDIAN HCM, INC.,

               Plaintiff,

vs.

LUTHERAN HOMES OF MICHIGAN
INC.,

               Defendant.

_____/

Civil Action No. 15-CV-13650

HON. MARK A. GOLDSMITH

**<u>OPINION AND ORDER GRANTING IN PART AND DENYING WITHOUT
PREJUDICE IN PART DEFENDANT'S MOTION TO DISMISS (Dkt. 8)</u>**

This case comes to the Court from Minnesota, where Plaintiff Ceridian HCM, Inc. ("Ceridian") initially sued Defendant Lutheran Homes of Michigan, Inc. ("Lutheran") for breach of contract and unjust enrichment, alleging that Lutheran terminated a service agreement between the two parties when it drastically and unilaterally reduced the amount of services to be provided under the agreement. The parties agreed to transfer the case to the Eastern District of Michigan, and Lutheran promptly filed a motion to dismiss, arguing principally that Ceridian's lawsuit was premised on an understanding not contained within the four corners of the agreement. However, when examining the contract as a whole, the parties' intent concerning the amount of services to be provided is ambiguous, and could reasonably be interpreted to support Ceridian's position; accordingly, Ceridian has set forth a plausible argument that the parties did not establish a framework that would permit Lutheran to eviscerate the contract in the manner it allegedly did. Thus, Lutheran's motion is denied, without prejudice, as to the breach of contract claim. The unjust enrichment claim, however, will be dismissed, because there is an express contract governing the instant dispute.

1

# I. BACKGROUND

On July 27, 2012, the parties entered into an arrangement under which Ceridian would provide Lutheran with certain applications and software, among other services, that would enable Lutheran to manage certain human resource information.  Compl. ¶ 6 (Dkt. 1-1).  The arrangement was memorialized in a Service Agreement, two service exhibits — an HR Payroll Service Exhibit and a Workforce Management Service Exhibit — and a Pricing Schedule.  Id. ¶¶ 6-7; see also Service Agreement, Ex. A to Compl., at 12 of 47 (cm/ecf page) (Dkt. 1-1).  The crux of the agreement was for Ceridian to provide Lutheran "with an on-line, Web-based application, consisting of all Subscribed Modules" enabling Lutheran to process and store employee-related information, as well as to process payroll and perform other human resources-related activities.  Compl. ¶¶ 8-9.

Per the Service Agreement, Lutheran was to be charged a one-time service fee associated with implementation of the software, all pre-production fees, and a monthly fee for recurring services.  Id. ¶ 6; see also, e.g., Service Agreement at 32, 40 of 47 (cm/ecf pages) (outlining fees and payment for services performed under each service exhibit).  A Pricing Schedule attached to the Service Agreement quotes Ceridian estimated one-time charges, estimated monthly charges, and estimated annual charges.  Service Agreement at 20 of 47 (cm/ecf page).  Many of the estimated charges encompass a set rate; others (most prominently, the monthly recurring charges) are derived by multiplying a given rate by a specified quantity.  Id.  The service exhibits state that the estimated annual charges listed in the Pricing Schedule "are estimates only, based on [Lutheran's] Number of Employees . . . as at the date of signing this Service Exhibit."  Id. at 32, 40 of 47 (cm/ecf pages); Compl. ¶ 12.  At the time of signing, Lutheran had 1,000 employees.  Compl. ¶ 13; Service Agreement at 23, 34 of 47 (cm/ecf pages).  The parties agreed

that "any change in the Number of Employees shall result in a corresponding change in the Fees payable by [Lutheran]." Compl. ¶ 10; Service Agreement at 30, 37 of 47 (cm/ecf pages).

The monthly recurring fees for both HR Payroll services and Workforce Management services are broken down into two distinct phases: a Pre-Production Period and a Post-Production Period. Service Agreement at 32, 40 of 47 (cm/ecf pages). For both types of services, Post-Production monthly fees were to commence on the "Service Start Date" and be based on the "Number of Employees" on the 15th of each calendar month. Id.[1] "Number of Employees" is a term of art, defined in the HR Payroll Service Exhibit as follows:

> [T]he number of employee records marked "active" in the employee master file of the Software, including full-time and part-time employees as well as any contingent labor or contractors, or any other individual in respect of whom information is being recorded in a Subscribed Module, and all administrators or other users who are accessing the Software or database relating to the Services (for the purposes of this Service Exhibit, each shall be considered an "Employee")[.]

Id. at 24 of 47 (cm/ecf page) (emphasis in original).[2] The "Service Start Date" is "the actual date on which the Services move beyond the test stage and Ceridian has confirmed (acting reasonably) that the Services are ready for use in a live production environment, which will generally be when the Software is loaded with Client organizational structure, employee information and Client specific rules and Client has administrative control of the Software." Id. at 24, 34-35 of 47 (cm/ecf pages) (emphasis in original). The anticipated Service Start Date was January 1, 2013. Id. at 23, 34 of 47 (cm/ecf pages).

---

[1] The monthly recurring fees for HR Payroll services are further separated into fees for "subscribed modules" and "services." Service Agreement at 32 of 47 (cm/ecf page). The pricing structure for both of these subsets is as described above, except the pricing for "services" is qualified by the phrase, "unless otherwise stated on the Pricing Schedule." Id.

[2] The Workforce Management Service Exhibit's definition of "Number of Employees," differs in just one respect: there is no requirement that the employee record be marked "active." See id. at 34 of 47 (cm/ecf page).

Prior to the Service Start Date, upon the initial implementation of the software, a Pre-Production Period commenced, for "purposes of configuration, user testing and implementation team training." Id. at 32, 40 of 47 (cm/ecf pages). During this Pre-Production Period, Lutheran was to pay Ceridian "a pre-production monthly Recurring Fee equal to 50% of the regular monthly Recurring Fees," and the "monthly Pre-Production Period Fee [was to] be based on the actual number of [Lutheran] employees as at the date the Service Exhibit is signed, regardless of the actual Number of Employees loaded into the Software during the Pre-Production Period." Id.

The Service Agreement also contains an integration clause, stating:

> The Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and supersedes all prior or contemporaneous agreements and understandings regarding the subject matter hereof, whether written or verbal. Any amendment to the Agreement must be in writing and signed by authorized representatives of both Parties.

Id. at 19 of 47 (cm/ecf page).

From mid-2012 until early January 2015, Ceridian invoiced Lutheran various one-time service and recurring monthly charges, which Lutheran routinely paid. Compl. ¶ 17. However, on January 23, 2015, Ceridian discovered that Lutheran "had unilaterally purported to reduce its payroll service with [Ceridian] to a single employee." Id. ¶ 18. Ceridian considered the action to be a breach and termination of the Service Agreement for convenience; it then terminated its own services under the agreement. Id. ¶¶ 20-22. The Service Agreement contained an early termination clause, which required Lutheran to pay an early termination fee in the event it terminated the Service Agreement prior to the planned expiration. Id. ¶ 24. Ceridian requested the fee it believed due pursuant to that provision; Lutheran did not pay that fee. Id. ¶ 30. Subsequently, Ceridian brought the instant suit for breach of contract and unjust enrichment.

4

## II.  STANDARD OF DECISION

When presented with a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), courts are obliged to construe the complaint in the light most favorable to the plaintiff and accept all well-pled factual allegations as true in determining whether the complaint states a plausible claim for relief.  Albrecht v. Treon, 617 F.3d 890, 893 (6th Cir. 2010).  Still, the plaintiff must provide the grounds for its entitlement to relief, which necessarily requires more than labels and conclusions or a formulaic recitation of the elements that comprise a cause of action.  Id.  Moreover, courts are not bound to accept as true legal conclusions, even when presented as a factual allegation.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."  Id. at 679.  Plausibility, in turn, requires a "reasonable inference that the defendant is liable for the misconduct alleged"; "facts that are 'merely consistent with' a defendant's liability" are insufficient.  Id. at 678.

In considering a motion to dismiss, courts may rely on the complaint, documents incorporated by reference into the complaint and integral to the plaintiff's claims, documents attached as exhibits to the complaint, and matters of public record.  Commercial Money Ctr., Inc. v. Ill. Union Ins. Co., 508 F.3d 327, 335-336 (6th Cir. 2007).

## III.  ANALYSIS

### A.  Breach of Contract

Ceridian claims that in unilaterally reducing its payroll service to just one employee, Lutheran effectively terminated the contract for convenience prior to the contract's expiration.  Compl. ¶ 34.  The claim rests on an alleged understanding between the parties, at the time the agreement was negotiated and executed, that while "the number of employees might increase or

decrease over time, [Ceridian] would continue to provide services to essentially all of [Lutheran's] employees." Id. ¶ 14. In moving to dismiss this claim, Lutheran argues that this alleged understanding is both extrinsic to the agreement and inconsistent with it. Def. Mot. at 10-11 (Dkt. 8). Lutheran further argues that because the Service Agreement is fully integrated, Ceridian is barred from introducing parol evidence to either explain the meaning of the contract's terms or to impose a new and inconsistent obligation upon Lutheran. Id. at 11. Ceridian disputes that the parties' understanding is extrinsic to the contract; rather, Ceridian contends that the contract, when read as a whole, unambiguously demonstrates the parties' intent that all of Lutheran's employees be enrolled in Ceridian's system. Pl. Resp. at 10 (Dkt. 12).

The Court is not persuaded by either position, concluding that, at this stage in the proceedings, the contract can plausibly be viewed as ambiguous as to the parties' intent. "A contract is ambiguous when the language is susceptible to more than one reasonable interpretation." Savela v. City of Duluth, 806 N.W.2d 793, 801 (Minn. 2011).[3] Importantly, contractual language should not be isolated from its context, but, rather, "given a meaning in accordance with the obvious purpose of the contract [ ] as a whole." Id. (quoting Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc., 666 N.W.2d 320, 324 (Minn. 2003)). Moreover, a contract must be interpreted so as to give all of its provisions meaning. Current Tech. Concepts, Inc. v. Irie Enters., Inc., 530 N.W.2d 539, 543 (Minn. 1995). Accordingly, courts look to the contract "as a whole to determine if there is more than one reasonable interpretation." Savela, 806 N.W.2d at 801.

Without venturing an opinion on the merits of each of Ceridian's specific assertions, the Court concludes that the Service Agreement may plausibly be viewed as ambiguous regarding

---

[3] The parties agree that Minnesota law governs the contract and any related disputes. Def. Mot. at 10; Pl. Resp. at 7.

whether the parties intended Ceridian to service essentially all of Lutheran's workforce. Accordingly, even assuming that Ceridian's claim is based on an extrinsic understanding, parol evidence is admissible to divine the intent of the parties, and Ceridian has plausibly pleaded a claim for breach of contract. See Mollico v. Mollico, 628 N.W.2d 637, 640-641 (Minn. Ct. App. 2001) ("When the terms of a written instrument are ambiguous, parol evidence is admissible.").

Lutheran emphasizes that the contract specifically allows that a change in the "Number of Employees" triggers a corresponding change in fees, and that "Number of Employees," in turn, is defined not by Lutheran's total workforce in any given month, but by the number of employee records active or maintained in the software. Def. Mot. at 14-15. The contract could have expressly defined the "Number of Employees" as all of Lutheran's employees for a given month, Lutheran continues, but it failed to do so. Id. at 16. Nonetheless, the term "Number of Employees," as defined in the agreement, raises its own questions about whether this is as Lutheran says.

For instance, the contract takes care to elucidate that "employee records" includes full-time and part-time employees, contingent labor or contractors, and broadly covers any other individual whose information may be stored in the software or who is otherwise accessing the services provided by the software. Service Agreement at 24, 34 of 47 (cm/ecf pages). If the parties intended that the true measure of services to be provided was dependent simply and only on the number of records active or maintained in the system, why take pains to specify the records must be those of "employees," and then broadly define "employee" as indicated above? While Lutheran contends that the definition "inherently implies" that the number of employees may not be all of Lutheran's employees, Def. Mot. at 15, the definition at least equally implies that anyone who receives a form of remuneration from Lutheran is to be included within this

7

system, regardless of that individual's formal relationship with Lutheran.  Additionally, one service exhibit specifies that only those employee files marked "active," are to be counted. However, there is no indication in the agreement as to what "active" means, or why, or under what circumstances, an employee file would be inactive.[4]  If the contract permitted Lutheran to incur services for only those employees Lutheran chose to maintain in Ceridian's software, the distinction between "active" and "inactive" makes even less sense — why not just remove those "inactive" employees from the system?

Furthermore, other provisions of the contract suggest that the parties understood the term to encompass all of Lutheran's employees.  For instance, in indicating that the charges on the Pricing Schedule are "estimates only," the service exhibits state that those estimates are "based on [Lutheran's] Number of Employees . . . as at the date of signing this Service Exhibit." Service Agreement at 32, 40 of 47 (cm/ecf pages) (emphasis added).  The specific term "Number of Employees" is used in this context, but the Pricing Schedule itself is pegged to the actual number of Lutheran's employees at the time the agreement was signed, not "the number of employee records marked 'active' in the employee master file of the Software."  Compl. ¶¶ 12-13.  Using the term in this context further confuses the issue and suggests that it may have been understood to encompass the total sum of Lutheran's workforce, which the parties recognized may fluctuate over time.  Id. ¶ 14.

Lutheran relies also on the varying fee structure between the Pre-Production Period and the Post-Production Period — the former based on the total number of Lutheran's employees and the latter based on the "Number of Employees" as defined in the service exhibits — as evidence

---

[4] At oral argument, counsel for Ceridian offered that the term "active" was meant to distinguish those employees currently receiving a paycheck from employees who were not receiving a paycheck, because they were on unpaid leave.  However, nothing in the pleadings addresses that point.

that the parties did not intend "Number of Employees" to contemplate Lutheran's total workforce. Def. Mot. at 15-16. Had the intent been to cover all of Lutheran's employees, Lutheran argues, there would be no need to distinguish between the fee structures for those two phases. Id. at 16. However, Lutheran's argument is undermined by the Pricing Schedule's estimation of costs, many of which are benchmarked to the actual number of Lutheran's employees as of the date of execution (1,000). See Service Agreement at 20 of 47 (cm/ecf page). While the Court is cognizant that the costs are indeed estimates, such estimates would be virtually meaningless if the contract truly contemplated that Lutheran could unilaterally adjust the number of employees for which it engaged Ceridian's services from anywhere from one to approximately 1,000. See Pl. Resp. at 15.

And the distinction between the fee structures for the Pre-Production Period and the Post-Production Period makes sense even under Ceridian's theory if, as the contract indicates, the Pre-Production Period was solely for "purposes of configuration, user testing and implementation team training." Service Agreement at 32, 40 of 47 (cm/ecf pages). Thus, it appears from the contract that during the Pre-Production Period Lutheran was not actually utilizing Ceridian's services and, therefore, there may have been very few or no employee records loaded into the software at that time. See Pl. Resp. at 16 ("[A]ny fluctuation in employee numbers during pre-production would not matter, as the software would not actually be in use during pre-production.").

Accordingly, the contract supports a reasonable inference that the number of Lutheran's employees at the time of execution of the agreement was chosen for pricing purposes, with the understanding that once the Service Start Date commenced, and Ceridian began providing the full range of services promised under the agreement, all of Lutheran's employees would be

loaded into the software, the number of which may have gone up or down since execution of the agreement.[5]

Lutheran attempts to confine the relevance of the "actual number of employees" benchmark in the Pricing Schedule to the Pre-Production Period monthly fees, Def. Reply at 5 (Dkt. 17), but this too is far from clear. First, the Pricing Schedule sets forth estimates for the first two years of a three-year service agreement, seemingly beyond the Pre-Production Period, making those estimates relevant for what Lutheran could expect to incur for the remainder of the contract. See Service Agreement at 20 of 47 (cm/ecf page). Second, the Pre-Production Period's 50% discount appears to be taken from the undiscounted rates established by the Pricing Schedule, which also suggests those estimates were targeted toward the Post-Production Period. See id.

Moreover, to read the contract as Lutheran suggests would also render meaningless what was negotiated as a significant consequence for any early termination by Lutheran. Pl. Resp. at 17-19. As pleaded in the complaint, the early termination fee recognized the "considerable, uncompensated resources" Ceridian invested into the initiation of its relationship with Lutheran,

---

[5] Lutheran argues that the understanding underlying Ceridian's claim — that all of Lutheran's employees must be enrolled in the system — effectively "impose[s] a restrictive exclusivity requirement upon [Lutheran] when no such requirement is articulated in the Agreement." Def. Reply at 2 (Dkt. 17). Lutheran continues that such exclusivity agreements, being restraints of trade, are cautiously enforced and strictly construed even when expressly included in a contract, let alone when they are not. Id. at 2-3. However, the authorities Lutheran relies on to support this contention are not on point. Those cases dealt with restrictive covenants — provisions in lease agreements that restrict the use of premises located near a lessee so as to protect that lessee from competition. See Snyder's Drug Stores, Inc. v. Sheehy Props., Inc., 266 N.W.2d 882 (Minn. 1978); Tamarack Vill. Shopping Ctr. v. Galyan's Trading Co., Inc., No. A05-449, 2006 WL 224180 (Minn. Ct. App. Jan. 31, 2006). The agreement at issue here, a standard service agreement, is of an entirely different ilk. Assuming that Ceridian's interpretation is correct, it would merely require Lutheran to use Ceridian for a discrete set of services for a term-limited period of time. Accordingly, it is no different than any contract requiring a client to use a particular vendor for a particular set of services, and Lutheran has provided the Court with no authority that such a contract amounts to a restraint on trade.

and, in the event Ceridian did not recover that investment over the life of the agreement, the early termination fee was designed to reasonably compensate Ceridian for those unreimbursed expenses. Compl. ¶ 25. While Lutheran argues that Ceridian was already well-compensated for this initial investment by virtue of the one-time charges and the Pre-Production Period monthly fees, Def. Mot. at 18-19, Lutheran still fails to imbue the early termination clause with any significant meaning. Lutheran attempts to rectify this by pointing to other benefits Ceridian received from Lutheran under the contract, and would have continued to receive regardless of whether Lutheran used Ceridian's payroll services, arguing that these additional duties and/or obligations permit Lutheran to unilaterally adjust the number of employees maintained in the software without terminating the contract and nullifying its early termination provisions. Def. Reply at 3-4. However, these additional "obligations" appear to be ancillary to the thrust of the agreement, the provision of services in exchange for a fee, and seem to hold little value if Lutheran is not actually using Ceridian's services. See, e.g., Service Agreement at 23 of 47 (cm/ecf page) (stating client agrees, if requested, to act as reference for future clients, to allow client's name to be included on list of clients, to provide interviews or presentations regarding services, and to assist Ceridian in developing reports related to client solutions); id. at 33 of 47 (cm/ecf page) (same). The failure to fully account for such a consequential provision renders Lutheran's interpretation unfavorable under Minnesota law.

Lutheran contends that the ability to add and remove employees at will from the system was a "material and valuable term" of the contract, positing that it provided an important safeguard in the event Ceridian's software failed to function. Def. Mot. at 16-17, 18. However, Ceridian has set forth plausible arguments that such an ability, without triggering the early

11

termination provisions, would render the contract substantially illusory, because Lutheran would hold in its power whether to perform or not.

Because the contract, when read as a whole, is susceptible to more than one reasonable interpretation it can plausibly be viewed as ambiguous; parol evidence is both necessary and permissible to discern the parties' true intent.  Moreover, because the agreement reasonably supports the interpretation underlying Ceridian's breach of contract claim, Ceridian has, at this stage, plausibly pleaded a claim for relief in stating that Lutheran unilaterally reduced the number of employees in the software to just one employee, thereby terminating the agreement for convenience prior to its expiration and refusing to pay the early termination fee.  Compl. ¶¶ 28, 30, 34.

### B.  Unjust Enrichment

Lutheran also moves to dismiss Ceridian's count for unjust enrichment, contending such a claim must fail in the face of an applicable, and enforceable, express contract.  Def. Mot. at 22. Ceridian concedes this count was pleaded in the alternative to the breach of contract claim and that it does not seek recovery on both counts.  Pl. Resp. at 23-25.  Ceridian's only argument as to why the unjust enrichment claim should not be dismissed relies on the early stage of the instant litigation.  Id. at 23-24, 25.  However, given that there is an express contract between the parties covering the dispute, and no one is contesting the validity of that contract, the unjust enrichment claim cannot be maintained alongside the breach of contract claim.  See Caldas v. Affordable Granite & Stone, Inc., 820 N.W.2d 826, 838 (Minn. 2012) (unjust enrichment "does not apply when there is an enforceable contract that is applicable").

Accordingly, Lutheran's motion to dismiss as to the unjust enrichment claim is granted.

## IV.  CONCLUSION

For the reasons stated above, Lutheran's motion to dismiss (Dkt. 8) is denied, without prejudice, in part and granted in part.  Lutheran shall file its answer to the complaint on or before August 9, 2016.

SO ORDERED.


Dated:  July 27, 2016                         s/Mark A. Goldsmith
Detroit, Michigan                             MARK A. GOLDSMITH
                                              United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 27, 2016.

s/Karri Sandusky
Case Manager